IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ECONOMY PREMIER ASSURANCE COMPANY,<br><br>    Plaintiff,<br><br>v.<br><br>WILLIAM R. WELSH, *et al.*,<br><br>    Defendants. | Civil Action No. 14-1581<br><br>Judge Cathy Bissoon |

**MEMORANDUM ORDER**

**I. MEMORANDUM**

Pending before the Court is a motion for summary judgment filed by the Plaintiff, Economy Premier Assurance Company ("Plaintiff" or "Economy Premier") (Doc. 36).[1] Economy Premier seeks a declaration, pursuant to the Declaratory Judgment Act, 28 U.S.C. §2201, *et seq.,* that it has no duty to indemnify or defend a state court wrongful death action that was filed against its insured, Defendant William R. Welsh ("Welsh").[2] The state court action was initiated by Defendant Jody H. Menni ("Jody Menni"), individually and as executrix of the estate of her late husband, William E. Menni ("Menni"), after Welsh fatally shot Menni on July

---

[1] A moving party is entitled to summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). While all reasonable inferences must be drawn in favor of the nonmoving party, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment." Halsey v. Pfeiffer, 750 F.3d 273, 287 (3d Cir.2014) (quotation marks omitted). See also In re Asbestos Prod. Liab. Litig. (No. VI), No. 15-1988, 2016 WL 4750507, at *3 (3d Cir. Sept. 13, 2016).

[2] Although named in this lawsuit as a necessary and interested party, Defendant William R. Welsh has taken no position relative to the pending motion for summary judgment. (See Doc. 44.)

1

26, 2013. For the reasons stated herein, Plaintiff's motion for summary judgment will be granted.

**BACKGROUND**

The evidentiary record in this case includes the state court wrongful death complaint, the record from the state court criminal proceedings, and the documents comprising or related to the subject insurance policy. Based on these evidentiary submissions, the following facts are undisputed.

    A. <u>The Wrongful Death Complaint</u>

The complaint in the underlying state court action was filed in the Allegheny County Court of Common Pleas by Jody Menni, individually, and as Executrix of her husband's estate. (PCSMF at ¶ 3; see Pl.'s Ex. B, Doc. 40.)[3] The state court complaint alleges that Menni was overseeing a demolition project located across the street from Welsh Funeral Home in Homestead, Pennsylvania. (PCSMF at ¶ 4; Pl.'s Ex. B at ¶ 4.) While Menni was working on July 26, 2013, Welsh, the owner of Welsh Funeral Home, allegedly began shouting offensive and threatening remarks in his direction. (PCSFM at ¶ 5, Ex. B at ¶ 6.) When Menni approached Welsh and asked him to stop making the offensive and threatening remarks, a verbal confrontation ensued, during which Welsh brandished and discharged a .380 Kel Tec pistol that he had on his person. (PCSMF ¶ at 6; Ex. B at ¶¶ 7-9.) Menni was struck in the head and died as a result of the injuries sustained from the wound. (PCSMF at ¶ 7; Ex. B at ¶¶ 9-10.) During the interview with police, Welsh admitted he had shot Menni. (PCSMF at ¶ 8; Ex. B at ¶ 13.)

Based on the foregoing averments, Jody Menni asserts a wrongful death claim against Welsh on behalf of herself and her two sons, as set forth in Count I of the state court complaint.

---

[3] Citations to "PCSMF at ¶ ___" refer to Plaintiff's Concise Statement of Material Facts (Doc. 37) and Jody Menni's responses thereto (Doc. 46).

(PCSMF at ¶ 9; Pl.'s Ex. B at ¶¶ 16-22.) Jody Menni alleges that her husband's death was "directly and proximately caused by the negligence of Welsh in some, or all, of the following particulars": (a) in brandishing a loaded firearm in the presence of other persons; (b) in discharging a firearm in the direction of an unarmed individual; (c) in failing to safely handle a firearm in the presence of other persons; (d) in failing to keep the safety lock on his firearm in the presence of other persons; (e) in failing to keep a firearm holstered and/or otherwise safely stored on his person; (f) in failing to warn others prior to the discharge of a firearm; and (g) in exhibiting a complete and total lack of care with regard to the health, safety, and welfare of those around him. (PCSMF at ¶ 10; Ex. B at ¶ 17.) Jody Menni also asserts a survival claim against Welsh in Count II of her complaint. (PCSMF at ¶ 11; Ex. B at ¶¶ 23-25.) The complaint seeks damages for Menni's pain and suffering, medical expenses, lost income, and other losses allegedly sustained as a "direct and proximate result of the negligent conduct of Mr. Welsh...." (PCSMF at ¶ 12; Ex. B at ¶ 24.) The complaint further includes a claim for punitive damages based on "Mr. Welsh's allegedly reckless, careless, and outrageous conduct in unsafely brandishing a firearm resulting in fatal injuries to Mr. Menni." (PCSMF at ¶ 13; Ex. B at ¶ 25.)

### B. The Record From Welsh's Criminal Proceedings

Also included in the summary judgment record are portions of the record from Welsh's state court criminal proceedings, including the testimony of numerous witnesses who appeared at his nonjury trial. (Pl.'s Ex. C, Doc. 40.) Ralph Zimmerman is an individual who was present at the demolition site at the time of the shooting. Zimmerman recounted that, at around 11:45 a.m. on the day of the shooting, Welsh walked up through the parking lot. (PCSMF at ¶ 15.) According to Zimmerman, Menni and Welsh started speaking and Welsh advised that he wanted debris in the parking lot cleaned up. (Id. at ¶ 16.) Zimmerman testified that he heard a gunshot,

turned around, and saw Welsh shoot Menni a second time. (PCSMF at ¶¶ 17-18; Trial Tr. (Doc. 45-1) at 79:12-19.) Zimmerman then started to call 911. At that point Welsh, who was about halfway down the parking lot, turned to Zimmerman and said, "[G]o ahead. Call the F'ing police. I don't care what you do." (PCSMF at ¶ 19; Trial Tr. at 80:3-4.)

Vanessa West, another witness, was also present at the time of the incident and witnessed the shooting. Her account was as follows:

> We heard someone scream [Menni's] name from across the lot. We looked, and we saw a guy standing there with a gun. He shot him once. [Menni] like grabbed his head. He shot him again. He fell to the ground. Then [Welsh] turned and walked down the stairs.

(PCSMF at ¶ 20.)

Chief Jeffrey DeSimone of the Homestead Borough Police Department responded to the dispatch following the shooting. (PCSMF at ¶ 21.) Chief DiSimone recalled that he approached Welsh after the shooting, and Welsh offered to retrieve the gun. (Id. at ¶ 22.) A young female relative of Welsh's asked "what's going on" and Welsh "blurted that he had shot the son of a bitch." (PCSMF at ¶ 23; Trial Tr. at 120:5-10.) Chief DeSimone's recollection of this statement was corroborated by Corporal Stephen Adams, who was also present at Welsh's home after the shooting. (Id. at ¶ 24.) According to Corporal Adams, Welsh further stated, "I screwed up. He's still alive." (Id. at ¶ 25.)

The incident was investigated by Venerando Costa, a detective with the Allegheny Police Department's homicide unit. (PCSMF at ¶ 26.) He later testified as follows concerning his interview of Welsh:

> Mr. Welsh stated, after we were done reading his rights, he said no bullshit. I'll tell you what happened.
>
> He said he was tired. Him and Mr. Menni were in a long term – an argument. He was tired of being pushed around by Mr. Menni and [ ] he shot him.

4

***

> He stated that he, on the day that it occurred, that he was – Mr. Zimmerman was outside utilizing the backhoe, that Mr. Menni was in the parking lot supervising the job site.
>
> Mr. Welsh said he retrieved his gun from a closet, put it in his pants pocket, that he walked outside, walked to the parking lot. He got involved – that he began arguing with Mr. Menni.
>
> ***
>
> He stated they got into an argument, that he believed Mr. Menni pushed him, and that he pulled out his gun and shot him two times.

(PCSMF at ¶ 26; Trial Tr. at 144:15-145:25.) On cross-examination, Detective Costa was asked about Welsh's statement that he had been pushed:

> Q. ... You stated that Mr. Welsh stated that Mr. Menni grabbed him?
>
> A. Mr. Welsh stated he believed that Mr. Menni pushed him once.
>
> Q. Pushed him. Pushed him?
>
> A. And that he --- in my report, as he was turning away, I shot him.
>
> Q. As he was turning, not turned; correct?
>
> A. Turning away. That's what he stated.

(Trial Tr. at 153:17-25.)

The trial court also heard testimony from two expert witnesses. Dr. Kenneth Clark, a forensic pathologist, testified that Menni died as the result of two gunshot wounds to the head/neck. (Trial Tr. at 27:23-25, 41:6-20.) He estimated that the range of either shot was less than three feet. (Id. at 36:24-37:1.) Jason Very, an expert in firearms, examined the weapon and found it to be in good working condition. (Id. at 131:20-133:6, 134:21-136:8.) There were no indications of a defect in the weapon, such as a hair trigger. (Id. at 136:9-22.)

Based on the evidence presented at trial, Welsh was found guilty of murder and sentenced to 72 to 114 months' imprisonment. (PCSMF at ¶¶ 27-29.) In rendering his verdict,

the trial judge acquitted Welsh of first-degree murder because he did not believe Welsh specifically intended to kill Menni. (Trial Tr. at 274:5-8.) However, the trial judge convicted Welsh of third-degree murder, because he found that Welsh had acted with malice, defined as "an express hardness of heart, cruelty, recklessness of the consequences, and a mind regardless of social duty indicating unjustified disregard for the probability of death or great bodily harm." (Id. at 275:7-17.) The trial judge found that the Commonwealth had negated self-defense beyond a reasonable doubt, reasoning that "Mr. Welsh tragically put himself in this situation on that July 26th noon hour. I don't think he was confronted with death or deadly force." (Id. at 275:22-276:5.)

On appeal, the Pennsylvania Superior Court affirmed Welsh's conviction and sentence. (PCSMF at ¶¶ 31-32.) The court ruled that the totality of circumstances supported a finding that Welsh killed Menni with malice. (Id. at ¶ 36.) The Superior Court pointed to evidence that, upon seeing Menni at the worksite on the day in question, Welsh put a loaded .380 caliber Kel-Tec pistol in his pocket, walked through the parking lot, and called Menni's name. (Id. at ¶ 34.) Welsh then proceeded to shoot Menni twice in the neck, killing him. (Id. at ¶ 33.) After shooting the victim in a vital part of his body, Welsh "then walked away without rendering aid" and "showed no remorse." (Id. at ¶ 35.)

    C.  <u>The Subject Policy</u>

Economy Premier issued the subject renter's insurance policy to Welsh under policy number 1694694990 for the period October 2, 2012 to October 2, 2013. (PCSMF at ¶ 37.) The policy provided coverage for, among other things, "Liability, Medical Expenses and Optional Coverages," with the liability limit being $100,000 per "occurrence." (Id. at ¶ 38.) In relevant part, the policy provided:

> "We" will pay all sums for "bodily injury" and "property damage" to others for which the law holds "you" responsible because of an "occurrence" to which this coverage applies. This includes prejudgment interest awarded against "you."
>
> "We will defend "you" at "our" expense with counsel of "our" choice, against any suit seeking these damages. "We" may investigate, negotiate, or settle any suit. "We" are not obligated to defend any claim or suit seeking damages not covered under this policy.

(Id. at ¶ 39.)

The policy defines "bodily injury" as "any physical harm to the body including resulting sickness or disease. This term includes required care, loss of services and death if it is a result of such physical harm, sickness or disease."[4] (PCSMF at ¶ 40.) Further, the policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions during the term of the policy." (PCSMF at ¶ 41.)

The policy also contains an exclusion that precludes coverage, in relevant part, for:

> Intentional Loss. "We" do not cover "bodily injury" or "property damage" which is reasonably expected or intended by "you" or which is the result of "your" intentional and criminal acts or omissions. This exclusion is applicable even if:
>
> A. "you" lack the mental capacity to govern "your conduct;
>
> B. such "bodily injury" or "property damage" is of a different kind or degree than reasonably expected or intended by "you;" or
>
> C. such "bodily injury" or "property damage" is sustained by a different person than expected or intended by "you."
>
> This exclusion applies regardless of whether "you" are actually charged with or convicted of a crime.
>
> However, this exclusion does not apply to "bodily injury" or "property damage" resulting from the use of reasonable force by "you to protect persons or property.

(PCSMF at ¶ 42.) Finally, the policy excludes coverage for: "'bodily injury' or 'property damage' awards designated as punitive, exemplary or statutory multiple damages. (Id. at ¶ 43.)

---

[4] This definition is subject to certain exclusions not applicable here. (PCSMF at ¶ 40.)

## STANDARD OF REVIEW

Under Pennsylvania law,[5] "[a]n insurer's duty to defend an insured in litigation is broader than the duty to indemnify." Frog, Switch & Mfg. Co. v. Travelers Ins. Co., 193 F.3d 742, 746 (3d Cir. 1999) (citing Erie Ins. Exch. v. Claypoole, 673 A.2d 348, 355 (Pa. Super. Ct. 1996)). The "obligation to defend arises whenever the complaint filed by the injured party *may* potentially come within the coverage of the policy." Gedeon v. State Farm Mut. Auto. Ins. Co., 188 A.2d 320, 322 (Pa. 1963) (emphasis in original). "If a single claim in a multi-claim lawsuit is potentially covered, the insurer must defend all claims until there is no possibility that the underlying plaintiff could recover on a covered claim." Frog, Switch & Mfg. Co., 193 F.3d at 746 (citing Erie Ins. Exch. v. Transamerica Ins. Co., 533 A.2d 1363, 1368 (Pa. 1987)). The duty to defend continues until such time as the claim is limited to relief that the policy does not cover. Gen. Acc. Ins. Co. of Am. v. Allen, 692 A.2d 1089, 1095 (Pa. 1997). Conversely, if an injured party's complaint does not potentially come within the coverage of the policy, the duty to defend is not activated. See Erie Ins. Exch. v. Claypoole, 673 A.2d 348, 355-56 (Pa. Super. Ct. 1996) ("[O]nly allegations contained within the underlying complaint pertaining to injuries which are either actually or potentially within the scope of the insurance policy obligate the insurer to defend the insured.").

---

[5] A federal court exercising diversity jurisdiction is obliged to apply the substantive law of the state in which it sits, including the forum state's choice-of-law rules. Erie R.R. Co. v. Thompkins, 304 U.S. 64 (1939); Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). Under Pennsylvania choice of law rules, claims arising from an insurance policy are governed by the law of the state in which the policy was delivered. CAT Internet Servs., Inc. v. Providence Wash. Ins. Co., 333 F.3d 138, 141 (3d Cir.2003); Prudential Ins. Co. of Am. v. Prusky, No. CIV.A. 04-0462, 2008 WL 859217, at *17 (E.D. Pa. Mar. 31, 2008). Here, the parties' dispute concerns the terms of a renter's insurance policy delivered in Pennsylvania, and all parties appear to agree that Pennsylvania law applies. Inasmuch as Pennsylvania law governs this action, we treat Pennsylvania Supreme Court opinions as binding precedent and Pennsylvania Superior Court opinions as persuasive precedent. See State Farm Fire & Cas. Co. v. Mehlman, 589 F.3d 105, 107 n.2 (3d Cir. 2009).

A court ascertaining whether an insurer has a duty to defend its insured makes its determination by defining the scope of coverage under the insurance policy on which the insured relies and comparing the scope of coverage to the allegations of the underlying complaint. Ramara, Inc. v. Westfield Ins. Co., 814 F.3d 660, 673 (3d Cir. 2016); Gen. Accident Ins. Co. of Am. v. Allen, 692 A.2d 1089, 1095 (Pa. 1997). If the allegations of the underlying complaint potentially could support recovery under the policy, there will be coverage at least to the extent that the insurer has a duty to defend its insured in the case. Ramara, Inc., 814 F.3d at 673; Gen Accident Ins. Co. of Am., 692 A.2d at 1095. In determining the scope of coverage, "the particular cause of action that a complainant pleads is not determinative," and instead, "it is necessary to look at the factual allegations contained in the complaint." Mut. Benefit Ins. Co. v. Haver, 725 A.2d 743, 745 (Pa. 1999).

The insured has the initial burden of establishing coverage under an insurance policy. Butterfield v. Giuntoli, 670 A.2d 646, 651–52 (Pa. Super. Ct. 1995). If coverage is established, the insurer then bears the burden of proving that an exclusion applies. Madison Constr. Co. v. Harleysville Mut. Ins. Co., 735 A.2d 100, 106 (Pa. 1999).

**ANALYSIS**

The Court's first task, as noted, is to ascertain the scope of the policy's coverage. Interpretation of an insurance policy is a question of law for the Court, and the Court's "primary goal... is to ascertain the parties' intentions as manifested by the policy's terms." Liberty Mut. Ins. Co. v. Sweeney, 689 F.3d 288, 293 (3d Cir.2012) (quoting Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co., 908 A.2d 888, 897 (Pa. 2006)).

In this case, coverage for bodily injury claims is triggered only by an "occurrence," which is defined to mean an "accident." Thus, the policy's "bodily injury" coverage only applies

9

to the extent Menni's death was the result of an "accident." Although the term "accident" is not further defined in the policy, Pennsylvania law supplies meaning to that term, as recently explained by the Court of Appeals for the Third Circuit:

> In Donegal Mutual Insurance Co. v. Baumhammers, the Supreme Court of Pennsylvania said that, when "accident" is undefined in an insurance policy, Pennsylvania courts should treat the term as "refer[ing] to an unexpected and undesirable event occurring unintentionally ...." 595 Pa. 147, 938 A.2d 286, 292 (2007). [T]he key term in the definition of the "accident" is "unexpected" which implies a degree of fortuity. An injury therefore is not "accidental" if the injury was the natural and expected result of the insured's actions.... See also Minnesota Fire and Cas. Co. v. Greenfield, 579 Pa. 333, 855 A.2d 854, 870 (2004) ("'Accident' has been defined in the context of insurance contracts as an event or happening without human agency or, if happening through such agency, an event which, under circumstances, is unusual and not expected by the person to whom it happens.") (internal citations omitted). That definition comports with the basic purpose of insurance: "to cover only fortuitous losses." United Servs. Auto. Ass'n v. Elitzky, 358 Pa.Super. 362, 517 A.2d 982, 986 (1986).

Auto-Owners Ins. Co. v. Stevens & Ricci Inc., No. 15-2080, 2016 WL 4547641, at *11 (3d Cir. Sept. 1, 2016). In other words,

> [a]n accident, simply stated, is merely an unanticipated event; it is something which occurs not as the result of natural routine but as the culmination of forces working without design, coordination or plan. And the more disorganized the forces, the more confusedly they operate, the more indiscriminately haphazard the clash and intermingling, the more perfect is the resulting accident.

State Farm Fire & Cas. Co. v. Estate of Mehlman, 589 F.3d 105, 111 (3d Cir. 2009) (citing Brenneman v. St. Paul Fire & Marine Ins. Co., 192 A.2d 745, 747 (Pa. 1963)). "Moreover, '[q]ualification of a particular incident as an accident seems to depend on two criteria: 1. the degree of foreseeability, and 2. the state of mind of the actor in intending or not intending the result." Id. (citing Black's Law Dictionary 16 (9th ed. 2009)) (alteration in the original).

In determining whether the injury in question resulted from an accident, the Court must view the operative events from the perspective of Welsh, since Economy Premier insured him and not Menni. Estate of Mehlman, 589 F.3d at 111. Whether the events were unexpected from

the victim's point of view is therefore irrelevant. See id. ("Accordingly, it is of no significance in our analysis that the events in question were unexpected, as they surely must have been, when viewed through the eyes of [the victim].").

With this understanding in mind, the Court must compare the scope of coverage to the allegations in the state court complaint. Our analysis is driven not by the cause of action pled, but by the factual allegations set forth in the complaint. See Haver, 725 A.2d at 745.

Here, despite Jody Menni's attempt to frame Welsh's actions in terms of "negligence" in the state court complaint, it is clear that the injury Welsh inflicted on Menni was not "accidental." The state court complaint alleges that Menni died after being shot in the head by Welsh. (Pl.'s Ex. B at ¶¶ 9-10, Doc. 40-1.) Further, it is alleged that the shooting occurred after Welsh began shouting offensive and threatening remarks at Menni, giving rise to a verbal confrontation between the two men, during which Welsh brandished a loaded handgun. (Id. at ¶¶ 6-8.) Jody Menni asserts that Welsh acted wrongfully not only by "brandish[ing] the loaded firearm in the presence of other persons" but also by "discharg[ing] the firearm in the direction of an unarmed individual." (Id. at ¶ 17.) Under Pennsylvania law, "[a]n actor is presumed to intend the natural and expected results of his actions." Estate of Mehlman, 589 F.3d at 114 (citing Baumhammers, 938 A.2d at 292 ("An injury [ ] is not 'accidental' if the injury was the natural and expected result of the insured's actions.")). Therefore, based on Jody Menni's own averments, her husband's fatal injury was the "natural and expected result of the insured's actions," Stevens & Ricci Inc., 2016 WL 4547641, at *11, and not a "fortuitous loss." Id. As such, the shooting and resulting death of the decedent cannot be considered accidental. See e.g., Estate of Mehlman, 589 F.3d at 115 ("Damages resulting from a violent assault with a deadly weapon are 'exactly the type of injury against which insurance companies are not and should not

11

be expected to insure.'") (quoting Germantown Ins. Co. v. Martin, 595 A.2d 1172, 1175 (Pa. Super. Ct. 1991)); Gene's Restaurant, Inc. v. Nationwide Ins. Co., 548 A.2d at 246, 247 n. 1 (Pa. 1988) ("[A]n 'occurrence' must be an accident which a malicious, willful assault and beating could never be.").

Nevertheless, even if this Court were to conclude that the state court complaint sufficiently alleges "accidental" conduct, thereby ostensibly triggering Economy Premier's duty to defend, our analysis would not end there. Economy Premier also disputes that it has any duty to indemnify Welsh for the damages Menni seeks. Under Pennsylvania law, an insurer's duty to defend ends when the insurer can prove it has no duty to indemnify its insured on any claims remaining in the underlying action. See Utica First Ins. Co. v. Maclean, No. CIV.A. 08-1138, 2009 WL 415988, at *6 (E.D. Pa. Feb. 19, 2009) ("If the allegations in a complaint trigger an insurer's duty to defend, the insurer must defend until 'it [can] confine the claim to a recovery that the policy [does] not cover.'") (quoting D'Auria v. Zurich Ins. Co., 507 A.2d 857, 859 (Pa. Super. Ct. 1986)); Biborosch v. Transamerica Ins. Co., 603 A.2d at 1055, 1058 (Pa. Super. Ct. 1992) ("[T]he insurer must defend until the suit is narrowed only to claims that are definitely not within that coverage."). Thus, "[a]lthough a complaint triggers an insurer's duty to defend, that duty 'is not necessarily frozen in stasis,' and it can end when the insurer can prove that its policy does not obligate it to indemnify the insured." MacLean, 2009 WL 415988, at *6 (quoting State Farm Fire & Casualty Co. v. Cooper, No. Civ. A. 00–5538, 2001 WL 1287574, *3 (E.D. Pa. Oct.24, 2001) (internal quotation marks omitted). See also Comm. Union Ins. Co. v. Pittsburgh Corning Corp., 789 F.2d 214, 218, 220 (3d Cir.1986) ("There is no principle of Pennsylvania law that the duty to defend automatically 'attaches' at the outset of the litigation and cannot

12

afterwards terminate.") (court holding that an insurance company's duty to defend its insured terminated with its duty to indemnify).

Economy Premier argues that, based on the evidentiary record before the Court, it has no duty to indemnify Welsh relative to Jody Menni's state court claims because Welsh's conduct in shooting Menni was intentional rather than accidental; therefore, as a matter of law, no covered "occurrence" can be established and, moreover, any claim for benefits is barred by the policy's exclusion for intentional acts. In analyzing Economy Premier's duty to indemnify its insured, we may look beyond the factual allegations in the complaint to determine whether the subject policy actually covers the claims in Menni's state court action. See Utica First Ins. Co. v. Maclean, No. CIV.A. 08-1138, 2009 WL 415988, at *6 (E.D. Pa. Feb. 19, 2009); Pacific Indemnity Co. v. Linn, 590 F. Supp. 643, 650 (E.D.Pa.1984).

When doing so, it is apparent that Welsh's conduct falls outside the scope of coverage afforded by the policy. As noted above, the policy only affords coverage for bodily injury that results from accidental occurrences. In addition, the policy expressly excludes coverage for bodily injury that is "reasonably expected or intended by [the insured] or which is the result of the [insured's] intentional and criminal acts..." (Pl.'s Ex. I at 1, Doc. 40-1.) The exclusion applies even if the bodily injury sustained "is of a different kind or degree than reasonably expected or intended by [the insured]." (Id.)

Here, there can be no doubt, based on the uncontroverted evidence of record, that Welsh's conduct was intentional and that the injury he inflicted was "reasonably expected" within the meaning of the policy. As set forth above, the record shows that Welsh, after seeing Menni at the demolition site, obtained a loaded gun, placed the gun in his pants pocket, walked over to the area where Menni was working, and confronted him. At some point during the

ensuing verbal altercation, Welsh shot Menni two times in the head/neck area at close range. Having twice shot Menni in a vital area of his body, Welsh then walked away without attempting to render any aid and told Zimmerman, "Go ahead. Call the f'ing police. I don't care what you do." Moreover, shortly after the shooting, Welsh commented that he had shot "the son of a bitch" and further stated, "I screwed up. He's still alive." As the Superior Court noted, Welsh showed no remorse for his actions. Even viewed in the light most favorable to the non-movant, Jody Menni, the evidence of record is incapable of supporting a reasonable inference that the shooting was unintentional.

In her brief opposing summary judgment, Jody Menni argues that there are discrepancies in the record concerning the logistics of how the shooting occurred. She points to inconsistencies as among the various accounts given by the trial witnesses but, viewed in context, these discrepancies are minor and do not reasonably support the conclusion that the shooting was in any way accidental.

Jody Menni also argues that the issue of Welsh's intent remains a question of fact because, even though Welsh was convicted of third degree murder, that crime does not require a specific intent to kill. She refers the Court to <u>Stidham v.Millvale Sportsmen's Club</u>, 618 A.2d 945 (Pa. Super. Ct. 1992), wherein the court found that the insured's guilty plea to third degree murder, after shooting a patron in a bar, did not conclusively resolve the issue of his intent for purposes of determining insurance coverage.

It is true that a conviction for third-degree murder does not require a specific intent to kill and instead requires only that the killing be undertaken with malice, which is defined as:

> wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured[.] Malice may be found where the defendant

14

> consciously disregarded an unjustified and extremely high risk that his actions might cause serious bodily injury.

(Pl.'s Ex. G (Doc. 40-1), Com. v. Welsh, No. 8 WDA 2015, at p.10 (Pa. Super. Ct. Sept. 29, 2015) (quoting Commonwealth v. Thompson, 106 A.3d 742, 757 (Pa. Super. Ct. 2014)).) In Stidham, the court recognized that the "malice necessary to support a murder conviction may ... exist where the principal acts in gross deviation from the standard of reasonable care, failing to perceive that such actions might create a substantial and unjustifiable risk of death or serious bodily injury." 618 A.2d at 951. The court noted that the insured's precise degree of conscious awareness was never determined in his criminal proceedings because he claimed to have suffered from an alcoholic blackout at the time of the shooting. Id. Further, his guilty plea did "nothing to enlighten [the court] regarding his intent to shoot and kill [the victim]." Id. at 953. Therefore, while the plea was admissible evidence, it was "hardly conclusive evidence of [the insured's] intent" and could not operate as a bar to recovery of insurance benefits. Id. In arriving at its ruling, the court distinguished Donegal Mut. Ins. Co. v. Ferrara, 522 A.2d 699 (Pa. Super. Ct. 1989), wherein benefits were denied to an insured who repeatedly kicked a police officer in the groin during an arrest, and Germantown Ins. Co. v. Martin, wherein benefits were denied to an insured who killed or wounded several persons in a shooting spree. The Stidham court noted that, in both these cases, "the insured's intent was conclusively established by evidence independent of any unilateral guilty plea." 618 A.2d at 952.

As an initial matter, we note that it is not the intent to kill, but Welsh's intent to fire a loaded handgun at Menni and harm him, that is relevant for present purposes. See PCSMF at ¶ 42 (noting that the policy excludes coverage for bodily injury that results from the insured's "intentional and criminal acts," even where the resulting injury "is of a different kind or degree

15

than reasonably expected or intended" by the insured); see also Estate of Mehlman,589 F.3d 115 (concluding that the insured's alleged actions demonstrated an unmistakable intent to cause harm to the victim).

Unlike Stidham – but like Donegal and Martin, the case at bar presents ample evidence from which the requisite intent on the part of the insured can be conclusively established. As previously discussed, the evidence in this case demonstrates that Welsh shot Menni twice in the neck at close range. His actions and statements thereafter demonstrate unambiguously that the shooting was intentional. While Jody Menni alludes to the possibility that her husband may have been shot accidentally in the course of a physical struggle with Welsh, there is nothing in the record to support such an inference. At best, the evidence suggests that Welsh "believed" that Menni may have pushed him once prior to the shooting. But Welsh also admitted to the police that he had fired his handgun as Menni was in the process of "turning away." Insofar as Welsh argued a theory of self-defense, this theory was rejected by the trial judge, who specifically found that the prosecution had proven an *absence* of provocation or self-defense beyond a reasonable doubt. (Trial. Tr. at 275:22-276:21, Doc. 45-1.) Moreover, in his subsequent written opinion addressing Welsh's challenge to the conviction, the trial judge specifically stated that "the facts presented led this [c]ourt to find that malice existed *as well as the specific intent to harm.*" (Pl.'s Ex. G at 9, Doc. 40-1 (emphasis added).) The trial judge's conclusion was fully consistent with Pennsylvania law, which recognizes that "[a]n actor is presumed to intend the natural and expected results of his actions." See Estate of Mehlman, 589 F.3d at 114.

Ultimately, in order to overcome summary judgment, Jody Menni "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Instead, she must point to

16

evidence that could support the existence of a genuinely disputed issue of fact concerning Welsh's intent to shoot and harm her husband. Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989) (The nonmovant "must present affirmative evidence in order to defeat a properly supported motion...and cannot simply reassert factually unsupported allegations"). However, she has not done so.[6] From the stipulated facts and the uncontested aspects of the state court record, the Court is compelled to conclude, as a matter of law, that Welsh's conduct was both criminal and intentional. Accordingly, Economy Premier owes no duty of indemnification to Welsh under the clear and unambiguous terms of the policy. Accord Estate of Mehlman, 589 F.3d at 114-116 (insurer had no duty to defend or indemnify insured's estate in civil action arising from insured's intentional act of discharging a handgun at the victim); Utica v. MacLean, 2009 WL 415988, at *8 (no duty to indemnify insured who intentionally shot and killed alleged aggressor; even if the insured was acting in self-defense, his conduct and resulting harm were intentional); Erie Ins. Exchange v. Heisey, 81 Pa. D.&C. 4th 18, 26-34 (Pa. Com. Pl. Feb. 12,

---

[6] In her brief, filed on January 13, 2016, Jody Menni represented that Welsh's deposition had been noticed in the underlying wrongful death litigation and was scheduled to occur on January 26, 2016 at SCI-Mercer. Mrs. Menni posited that "[o]nce this deposition is completed, the parties will have a clearer picture of the altercation between Mr. Welsh and Mr. Menni," (Def. Menni's Br. Opp. at 10, Doc. 45), and, until that time, a grant of summary judgment would be "premature." (Id.) At this point, more than eight months later, Welsh's deposition has not been made part of the record in this case, nor is there any indication that the deposition has in fact been taken. The Court's prior case management order set a discovery deadline for October 30, 2015 and indicated that extensions would be granted only for good cause shown and upon motion filed prior to the date on which discovery was set to close. (See Doc. 25 at ¶ 6.) Jody Menni never filed a motion seeking additional discovery prior to the discovery deadline and cannot do so now.

In any event, given the overwhelming evidence indicating the intentional nature of Welsh's conduct, there is no basis for assuming that Welsh would claim that the shooting was accidental. Even if he attempted to make such a claim in this litigation, he might well be collaterally estopped from contesting the intentional nature of his conduct. State Farm Fire & Cas. Co. v. Bellina, 264 F. Supp. 2d 198, 204–05 (E.D. Pa. 2003) ("In Pennsylvania, 'the victim of a criminal act is precluded from litigating the issue of the insured actor's intent where that intent has been established by independent evidence in the prior criminal proceedings.'") (quoting Stidham, 618 A.2d at 954).

2007) (insured's conduct in shooting victim three times in the head was intentional act excluded by policy provision and not an accidental "occurrence" that could give rise to insurance coverage).

Moreover, the public policy of this Commonwealth precludes coverage for Welsh's conduct given the facts of this case. "The courts of Pennsylvania have refused to require an insurer to defend an insured for his own intentional torts and/or criminal acts." Germantown Ins. Co. v. Martin, 595 A.2d 1172, 1175 (Pa. Super. Ct. 1991); see also Blackman v. Wright, 716 A.2d 648, 650 (Pa. Super. Ct. 1998) ("[It] is against the public policy of this Commonwealth to provide insurance coverage for intentional acts."). Because Welsh's act of shooting Menni was both intentional and criminal, it would violate Pennsylvania public policy to extend insurance coverage in this case. See Minnesota Fire and Cas. Co. v. Greenfield, 855 A.2d 854, 866 (Pa. 2004) (finding, "as a matter of overriding public policy," that recovery of insurance proceeds was precluded for damages arising out of an insured's criminal acts regarding heroin, a Schedule I controlled substance); Martin, 595 A.2d at 1175 (concluding that coverage for an insured who committed murder would be contrary to Pennsylvania public policy); West v. Klein, No. Civ. A. 98-765, 1998 WL 351576, at *3 (E.D. Pa. June 29, 1998) (insured's conviction of third-degree murder based on an intentional shooting of the victim precluded insurance coverage on public policy grounds).

Finally, Economy Premier seeks a declaration that there is no coverage or duty to defend insofar as Menni seeks punitive damages in the underlying state court litigation. The Court finds that the policy unambiguously denies coverage for bodily injury damages that are punitive in nature (see Pl.'s Ex. I at 5, Doc. 40-1), and Jody Menni does not contend otherwise. Therefore,

the Court agrees that Economy Premier is entitled to summary judgment on Count III of its declaratory judgment complaint.

## II. <u>ORDER</u>

For the reasons stated above, IT IS ORDERED that Plaintiff's Motion for Summary Judgment (**Doc. 36**) is **GRANTED**. IT IS FURTHER ORDERED that Plaintiff Economy Premier Assurance Company owes no duty of defense or indemnity to Defendant William R. Welsh with respect to the underlying action filed by Defendant Jody H. Menni, Individually, and as Executrix of the Estate of William E. Menni; the July 26, 2013 shooting incident involving Defendant William Welsh and William Menni was not an "occurrence" within the meaning of the subject insurance policy issued by Plaintiff; and Defendant William Welsh's acts of shooting William Menni was an intentional act precluded from coverage under the subject insurance policy.

IT IS SO ORDERED.

September 29, 2016 <span style="float:right"><u>s/ Cathy Bissoon</u><br>Cathy Bissoon<br>United States District Judge</span>

cc (via ECF email notification):

All Counsel of Record